United States District Court
Northern District of New York

**#1**

**0**3 **-CV- 1 0 7 5**

Civil Case No:

Robert Jaegly Jr.

                    Plaintiff

        vs.

Matthew Couch
Bernard Santandria
Paula Breen
The City of Albany

                    Defendants

U.S. DISTRICT COURT
N.D. OF N.Y.
FILED
AUG 29 2003
$150 Pd
LAWRENCE K. BAERMAN, CLERK
ALBANY

Civil Rights **DNH / RFT**
Complaint
Pursuant to
42 USC 1983
and
Laws of New York

Summons Issd.
(WL)

The plaintiff in the above-captioned action alleges as follows:

**I. JURISDICTION**

1.    This is an action for money damages pursuant to both 42 USC
1983 and the laws of the State of New York.  Jurisdiction is both
by virtue of diversity and the subject matter of 42 USC 1983.


**II. PARTIES**


2.    Plaintiff:      Robert Jaegly Jr.

                      Box 44004

                      Fort Washington MD 20749

        Plaintiff is a resident of the State of Maryland.


3.    Defendant:      Matthew Couch

                      employee of the City of Albany

                      Albany NY 12207


4.    Defendant:      Bernard Santandria

                      former employee of the City of Albany

Albany NY 12207

5.    Defendant:    Paula Breen

employee of the City of Albany

Albany NY 12207

6.    Defendant:    The City of Albany

a municipality of the State of New York

Albany NY 12207

---

## III. FACTS

7.    During the week of Dec. 3, 2001, plaintiff Robert Jaegly
discovered pasted in the window of a pickup truck parked across
from his residence at the time, copies of an Order of Protection
issued by City Court of Albany on Nov. 20, 2001 in favor of
Philip Zeller.  The order commanded plaintiff to stay away from
the home, business, etc, of Mr. Zeller but did not specify any
location or address of Mr. Zeller.  Mr. Zeller, under threat of
eviction, had moved from the house at 418 Elk St. where plaintiff
was a guest in great secrecy and without telling the owner or
plaintiff his new address.

8.    The Order of Protection had been issued as the result of a
summons charging Harassment 2nd Degree- threatening "to pound"

Mr. Zeller- received not coincidentally the day Mr. Zeller moved
from 418 Elk St.  The order and ACOD disposition had been agreed
to only under duress, and because the Court stated that any other
disposition would not be considered promptly and would require
plaintiff's continued presence in Albany.

9.    Before Nov. 20 plaintiff had experienced intimidation and
threats of violence personally from Mr. Zeller; between Nov. 20
and Dec. 3, plaintiff experienced various acts of harassment
involving notes, garbage, etc which plaintiff attributed to Mr.
Zeller.

10.   About 3:30PM on Dec. 5, 2001, Albany Police Officer Matthew
Couch arrested plaintiff after saying "you're going to spend the
night in jail" and personally booked, processed, and confined
plaintiff against his will at the Albany Police lockup.  Officer
Couch used deliberation in processing plaintiff, during which
several other prisoners were completely processed.

11.   On Dec. 6, 2001 plaintiff was given a copy of a felony
complaint signed by Couch, and charged with Criminal Contempt
First Degree, penal section 215.51-B5, before Judge John Egan.
Plaintiff was also given a copy of an Oral Statement Report, APD
#01-437969, signed by Matthew Couch, stating that on Dec. 5, 2001
at 3:20PM Robert Jaegly had made the statement "No, I only took
pictures of his car".  Plaintiff was released on bond posted at

City Court after being transported to Albany County Jail for no
purpose.

12.  At a preliminary hearing on Dec. 11, 2001, the felony charge
of Criminal Contempt First Degree was withdrawn.  Plaintiff was
then given a Prosecutor's Information dated Dec. 13, 2001 and
signed by Mary Tanner Richter charging plaintiff with Criminal
Contempt in the Second Degree, penal section 215.50(3).

13.  Penal section 215.51-B5 requires for a person to be guilty
that he, "with intent to harass, annoy, threaten or alarm a
person for whose protection such order was issued, strikes,
shoves, kicks or otherwise subjects such other person to physical
contact or attempts or threatens to do the same".

14.  The felony complaint dated Dec. 5, 2001 states: "The sources
of the deponent's information and the grounds for his belief are
oral statements made to deponent by defendant that he committed
the foregoing acts at the time, place and in the manner above set
forth; and/or from information obtained from witnesses whose
depositions are attached hereto and made a part hereof".  The
Oral Statement report signed by Matthew Couch did not give a
statement to the effect that Robert Jaegly subjected anyone to
physical contact or threatened to do so, nor did any other
deposition or statement.

15.  In the trial held Aug. 29, 2002 on the charge of Criminal
Contempt Second Degree, Officer Couch did not testify that Robert
Jaegly or any one else told him that Robert Jaegly had on Dec. 5,
2001 subjected Philip Zeller to physical contact or threatened to
do so.

16.  Penal section 215.50(3) requires for a person to be guilty
that he intentionally disobey or resist the lawful process or
other mandate of a court.

17.  The Prosecutor's Information dated Dec. 13, 2001 stated that
"while in front of 411 Elk St." the defendant "did intentionally
take several photographs of [Philip Zeller's] home and car".  It
was not disputed in later proceedings that "in front of 411 Elk
St." was the public street, on the only side permitted for
parking, also across from plaintiff's residence at 418 Elk St.
and the same distance from 411 Elk St. as plaintiff had been
every day since the order was issued on Nov. 20.

18.  The Prosecutor's Information dated Dec. 13, 2001 does not
allege any fact, or any belief, that plaintiff intended, by
taking photographs of the Order of Protection being used to
harass and annoy him in public, to violate said order.

19.  In October Mr. Zeller had provided a letter dated Oct. 3,
2001, "to verify that Philip Zeller Jr. ... has now achieved the

acceptance needed to proceed with his relocation", purportedly
from the Albany County Department of Social Services.  After
plaintiff discovered that he was to be charged in City Court with
"threatening to pound on" Mr. Zeller, he took that letter to
James Green at that Department and learned that the stationery of
the letter had been superceeded and should not have been used in
October of 2001, and that the letter appeared to him to be a
forgery.  Other officials determined that the terminology in the
letter was incorrect and the purported author was no one who was
associated with Mr. Zeller's case.

20.  After notarizing affidavits from Joseph Norton that he had
received the letter and had relied and been deceived by it, and
by the plaintiff that he had determined from named officials that
the letter had been falsely made, three unsuccessful attempts
were made to bring charges of Forgery 3rd Degree against Mr.
Zeller at the North Station of the Albany Police Department.

21.  On the third attempt, Jan. 4, 2002, Sergeant Nadoraski told
Mr. Norton and the plaintiff in this action, Mr. Jaegly, that
they must go to the District Attorney's Office to file any
complaint because of the current prosecution against Mr. Jaegly.

22.  On November 21, 2001, after appearing without adequate
notice in City Court the previous day, Janice Cellucci, the Chief
Clerk, was asked why a summons dated Oct. 31, 2001, was not

delivered until 3 business days before the scheduled hearing.
She stated that according to their records it had been properly
mailed and that it should have been received at least 2 weeks
before the hearing date.  She was shown the envelope that the
summons was received in, which had the date printed by Neopost
meter serial number 4181751 completely obscured, and became
physically startled.  She then said that such an envelope could
have been issued by their machine by error, but that the operator
would have redone it if the error had been noticed.

23.  On Dec. 10, 2001, a statement by Joseph Norton was
notarized, in which he describes the receipt of the letter
(containing the summons) from City Court, and that Philip Zeller
had access to Mr. Norton's mailbox and that Philip Zeller had
admitted stealing Mr. Norton's mail on other occasions.

24.  On Jan. 10, 2002, photographs of the envelope thru filters
while excited with ultraviolet light established that the
substance which obscured the postage meter date was different
than (fluorescent) postage meter ink, and that the date under the
obscuring substance could be clearly seen to be "OCT 31 '01".
The exact same procedure, applied to a control unobscured meter
imprint obtained from the Neopost dealer who serviced machine
#4181751, also showed a clear and sharp date which was identical
in sharpness and contrast to the ordinary-light appearance.

25.  On Feb. 15, 2002, a written statement was received from John Osborne, U.S. Postal Inspection Service, that in regard to plaintiff's complaint of mail theft, the U.S. Attorney's Office has guidelines which refer to local authorities the prosecution of cases with an amount of loss less than $10,000.

26.  On Mar. 1, 2002 an affidavit by Robert Jaegly was notarized stating that the envelope he received on November 14, 2001 was a written instrument issued by the City Court of Albany, a governmental instrumentality; that he discovered it had been stolen and falsely altered; that the alteration deceived him, and disadvantaged him, and advantaged Philip Zeller; and that Philip Zeller had the skill, means and opportunity to alter this envelope.

27.  On Mar. 7, 2002, Kimberly Mariani of the Albany County District Attorney's Office stated in connection with the affidavits alleging forgery dated Dec. 17 and Mar. 1, that a requirement for her office to approve cross-complaints was untrue and that complaints should be filed with the police department.

28.  On Mar. 7, 8, and 11, attempts were made to file charges of forgery at North Station with supervising sergeant and lieutenant.  Sergeant Canfora refused to believe the policy stated by Ms. Mariani and refused to take any complaint.  On Mar.

17, Lieutenant Congenni refused to look at any evidence and
stated that he would only take complaints from the Department of
Social Services or the City Court.

29.  On Mar. 18, 2002, the U.S. Attorney's office was given the
affidavit of Mar. 1 alleging theft of mail and forgery and copies
of the described photographs, along with Mr. Norton's affidavit
of Dec. 10 and the Feb. 15 statement from John Osborne.  On Mar.
20 Assistant U.S. Attorney Spina told plaintiff that the written
statement from Mr. Osborne was more than is usually given, that
the affidavits were adequate and any additional facts were the
duty of detectives, and that the refusal of Albany police to take
a complaint was unusual and very curious.

30.  On Mar. 26, 2002, the Albany Police Department Detective
Bureau told plaintiff that Detective Santandria handles
forgeries, and complaints should be filed at South Station.  On
the same date, Officer D. Walker and her sergeant refused to take
a complaint alleging forgery and advised that Detective
Santandria would have to approve; when he returned he looked only
at altered envelope, refused to look at affidavits, and stated
that US Attorney Spina was not qualified to refer matter to him
and that he would only investigate if a written statement was
obtained from a postal inspector saying that the envelope had
been altered.

31.  Later on Mar. 26, Postal Inspector Osborne stated he could
not personally look at envelope and any written statement would
have to come from the FBI Laboratory after opening a case, which
the guidelines precluded, and there was no evidence the Postal
Service was defrauded by this case.

32.  On Aug. 29, 2002, a trial was held on the charges of
Criminal Contempt Second Degree and Harassment Second Degree.
All charges were dismissed on the evidence before any defense was
presented.

33.  On Sep. 23, 2002, a Freedom of Information request was filed
with the Albany City Clerk requesting copies or inspection of 7
items relating to the events on Dec. 5, 2001, the documentation
of software used to produce reports previously furnished, and the
Standard Operation Procedures for the police department, except
for those parts which may be withheld under section 87 or 89 of
the New York Freedom of Information Law.

34.  On Feb. 28, 2003, a letter was received from Joseph Rabito,
City Clerk and Records Access Officer, answering the requests for
4 of the items and granting access for inspection "through the
Administrative Services Bureau of the Albany Police Department"
for item #3, a duty roster of officers, item #6, the software
documentation, and item #7, the Standard Operating Procedures.

35.  On May 6, 2003, the plaintiff went to the Albany Police
Department offices on Henry Johnson Blvd. following instructions
received the previous week from a person who answered a telephone
call directed to the Administrative Services Bureau.  There, he
presented the letter from Mr. Rabito as instructed.  The clerk
summoned Commander Breen, who recognized plaintiff, and after
glancing at the letter of requests which had been granted by Mr.
Rabito, stated that she was denying access because item #6 did
not exist and the request for item #7 was "overly broad".  She
did not give a reason for denying access to the duty roster.  The
plaintiff requested that she put the denials in writing but she
refused to write anything.

36.  On July 2, 2003 Lieutenant Flanger of the Albany Police
Department told plaintiff that the Rules and Regulations of the
department are incorporated into the Standard Operating
Procedures, that the Standard Operating Procedures do not contain
any confidential data and is available to the public, but that he
would not have told me that if he had known that I had been in
contact with Commander Breen and been given contradictory
information.

37.  On July 8, 2003, a letter was received from Robert Freeman,
executive director of the New York Department of State Committee
On Open Government giving an official opinion on the FOIL request
of Sep. 23 and the entire correspondence between Robert Jaegly

and the City of Albany concerning that request.  He stated that
some aspects of the Standard Operating Procedures must be
disclosed while others may be withheld, such as non-routine
investigative procedures, and that an agency is required to make
a review to determine which portions may be withheld.

38.  Article 89.3 of the New York Public Officer's Law states
that a denial of a FOIL request must be in writing.  Article 89.8
states that any person who with intent to prevent the public
inspection of a record willfully conceals any such record is
guilty of a violation.

39.  On Aug. 13, 2003, in response to a question about which
detective replaced the retired Detective Santandria and could
review his failure to take a forgery complaint, Detective
Sergeant Kevin Breen stated that [the evidence of theft and
forgery of the summons issued in the case which had been
dismissed] was "not a police matter", and that he would "have you
arrested" if he was spoken to again.

40.  On Mar. 5, 2002 a Notice Of Claim was filed with the City of
Albany for False Arrest, Battery, Criminal Tampering, and Failure
to Follow Lawful Orders & Regulations; on Nov. 21, 2002 a Notice
Of Claim was filed for Malicious Prosecution and Violation of
Civil Rights; on Aug. 1, 2003 a Notice Of Claim was filed for
Negligent Administration.

## IV. First Cause of Action for Malicious Prosecution Under New York Law

41. Matthew Couch was the complainant in a prosecution that was terminated in the defendant's favor. There was no probable cause for a belief in the defendant's guilt, as evidenced by false statements made on the original complaint, no evidence given for all of the elements of the crime charged on the replacing information, and no evidence such that a person of ordinary prudence could have believed that there was not a lawful reason for plaintiff's behavior or that plaintiff had any intention to violate an order of protection. Mr. Couch acted with malice in that he wilfully and after deliberation committed false arrest and he knew that the prosecution would not succeed. He had acted with probable cause so lacking as to permit inference that the arrest was maliciously instituted.

## V. Second Cause of Action for False Arrest Under Federal Law

42. Matthew Couch arrested the plaintiff in the present case, intending to, and making him "spend the night in jail", of which the plaintiff was aware of and did not consent, and for which there was no lawful reason. He acted with malice in that he knew there was no basis in the available evidence for a felony charge, and he knew or should have known that statements he was given were motivated by malice.

## VI. Third Cause of Action for Malicious Prosecution Under Federal Law

43.  Liability for malicious prosecution under New York law gives rise to liability by civil action for deprivation of rights under United States Code Volume 42 Section 1983.

44.  Additionally, the order of protection referred to in this case was the result of a malicious prosecution for harassment, the purpose of which was to restrain the liberty of plaintiff, not in jail, but in a locality in the jurisdiction of a local court which he would otherwise not be subject to the jurisdiction of.  This purpose was accomplished and continued by the subject prosecution for Criminal Contempt, and numerous appearances required over the course of nine months kept plaintiff from business in other states.

45.  Another deprivation of constitutional magnitude occurred when, unknown at first to plaintiff, he was originally brought under the jurisdiction of City Court by manipulation of the process of that Court in violation of his rights under the Constitution.  Incontrovertible physical evidence was obtained that showed that the date on the envelope sent from City Court had been falsely altered; there was no reason to believe that the alteration was or could have been done by the Postal Service or City Court, and thus it was likely done by theft of the summons

from plaintiff's mailbox, and likely for the reason of covering up the fact that the envelope had been stolen and kept for a period of time. Not having the date, by itself, took away plaintiff's right to contest the validity of a summons which had not been mailed according to law and hence was void, and plaintiff suffered other disadvantages due to being deprived of fair and proper notice of the charge against him.

46. Plaintiff was frustrated in bringing this fraud to the attention of a Court, as physical proof was not accepted, only a complaint filed with Albany police officers, who refused to allow a complaint to be made, as detailed above. Since only the fraud itself, and not the perpetrator, need have been proven to a court for the court to find that the subject prosecution was tainted, if either Lieutenant Congenni or Detective Santandria had performed their ministerial duty to simply take a complaint, plaintiff would have had the malicious prosecution terminated and been spared thousands of dollars in damages that later accrued.

**VII. Fourth Cause of Action for Failure to Perform Ministerial Duties Resulting in a Violation to the Right to Due Process and Equal Protection**

47. Although there is no right to "police protection" or any other governmental function that is discretionary and a duty only to the public at large, the act of simply taking a report is

ministerial and non-discretionary.  Article 12.2.60 of the Rules
and Regulations of the Albany Police Department in effect in
1987, and other rules and regulations, require that any
information of a police nature be reported, and officers have
been found in violation of that article for not taking a report
from a citizen.  Taking a report is ministerial according to the
reasoning of <u>Tango v. Tulevech</u>, 471 NYS2d 73, because the content
is provided by the citizen and results in substantially the same
complaint regardless of the minister.

48.  When an action is exclusively ministerial, a municipal
officer will be liable if the act is tortious and not justifiable
according to statutory command.  The regulations of the police
department establish a duty towards persons reporting crimes.  In
addition, a special duty exists towards persons already being
prosecuted, to act on complaints of fraud in their prosecution,
because due to the existing conduct of the department, inaction
would result in active injury instead of a lack of benefit.  "If
conduct has gone forward to such a stage that in action would
commonly result, not negatively merely in withholding a benefit,
but positively or actively in working an injury, there exists a
relation out of which arises a duty to go forward." [Bolen,
<u>Studies in the Law of Torts</u>, quoted in <u>H. R. Moch Co. v.
Rennsselaer Water Co.</u>, 247 NY 160, and <u>Schuster v. City of New
York</u>, 180 NYS2d 265]

49.  In the case at hand, the very fact that complaints were not taken in a routine and perfunctory way (and then ignored) acknowledged that a special relationship existed.  A motive may be offered for such conduct in that there might be perceived to be less risk of department discipline for avoiding a report than for neglecting to properly act on one that had been taken.  In any case, injury by way of legal expenses, etc, to the victim of a fraud via court process was foreseeable.

50.  When Detective Santandria refused to accept the authority of the US Attorney's office with regard to a postal matter and insisted on an action by a postal inspector for which the postal inspector had no inclination nor actual jurisdiction, and knowing that the matter concerned fraud on the process of a court which was prosecuting the complainant, he acted under color of law to interfere with the complainant's right to equal protection under the .

## VIII. Fifth Cause of Action For Violation of New York Public Officer's Law and Plaintiff's Civil Rights

51.  Commander Paula Breen deliberately disregarded the lawful order of the City of Albany Records Access Officer to make available for inspection the Standard Operating Procedures manual of the Albany Police Department and other records which were lawfully requested under the New York Freedom of Information Law.

52. Even if, through mistake, there were some parts of that manual that were withholdable by law and which should not have been ordered to be made available by the Records Access Officer, most parts of the manual (according to her subordinate), and many of those parts requested by the plaintiff in this action, (such as those parts of the manual giving the duties of various officers), are not withholdable and there was no lawful reason not to make as many parts of the manual as could be instantly determined to be disclosable available on May 6, 2003.

53. The act of making the records specified by the Records Access Officer available for inspection, unlike the act of advising the Records Access Officer which records to make available, is a ministerial function. Commander Breen recognized the plaintiff when he appeared to inspect records, and was aware, as a high-ranking department head, of plaintiff's Notice of Claim mentioning "regulations" about which the Chief of Police had been informed. Since Commander Breen, as a subordinate, had been ordered by the Records Access Officer to make records available to plaintiff, concealing them from plaintiff with the intent to prevent their inspection was a criminal act in violation of article 89.8. The breach of ministerial duty to make them available was thus retaliatory and criminal and intended to interfere with plaintiff's constitutional rights.

## IX. Sixth Cause of Action for Maintaining Harmful Policies and Procedures

54.  By the proof of the above causes of action, and by other acts committed as alleged by police officers Nadoraski, Canfora, Congenni, Walker, and Kevin Breen, the City of Albany is shown to have policy and procedures which cause the deprivation of rights, privileges, and immunities secured by the Constitution and Laws of the United States.

## X. Demand for Jury Trial

55.  Plaintiff demands a trial by jury.

## XI. Prayer For Relief

56.  Plaintiff demands judgement against the defendants as follows:

**First cause of action:**

Compensatory damages in the sum of $150,000.

Punitive damages in the sum of $150.000.

An award of costs and attorney's fees.

**Second cause of action:**

Compensatory damages in the sum of $150,000.

Punitive damages in the sum of $150.000.

An award of costs and attorney's fees.

Jaegly vs. Couch et al                     Page 20

**Third cause of action:**

Compensatory damages in the sum of $150,000.

Punitive damages in the sum of $150.000.

An award of costs and attorney's fees.


**Fourth cause of action:**

Compensatory damages in the sum of $50,000.

Punitive damages in the sum of $50.000.

An award of costs and attorney's fees.


**Fifth cause of action:**

Compensatory damages in the sum of $50,000.

Punitive damages in the sum of $50.000.

An award of costs and attorney's fees.


**Sixth cause of action:**

Compensatory damages in the sum of $500,000.

Punitive damages in the sum of $500.000.

An award of costs and attorney's fees.


Respectfully submitted,


Robert Jaegly Jr.                          August 29, 2003
Plaintiff pro se
Box 44004
Fort Washington MD 20749